# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:                                                    NUMBER

**DOROTHY CHASE STEWART**                         **07-11113**
                                                         **SECTION A**
DEBTOR
                                                         CHAPTER 13

## MEMORANDUM OPINION

On April 10, 2008, this Court rendered a judgment ("Judgment") in favor of the debtor, Dorothy Chase Stewart ("Debtor") on her Objection to the Claim filed by Wells Fargo Bank, N.A. ("Wells Fargo").  The Judgment awarded monetary damages and non-monetary sanctions, in the form of injunctive relief.  Wells Fargo appealed and requested a stay of the Judgment pending appeal.  That request was denied on July 3, 2008.

On July 1, 2008, in *Wells Fargo Bank, N.A. v. Jones,*[1]  the United States District Court for the Eastern District of Louisiana ("District Court") affirmed this Court's decision in *In re Jones*,[2] with one exception.  The District Court remanded *Jones* for additional findings regarding the award for injunctive relief.  Based upon the District Court's ruling in *Jones,* Wells Fargo re-urges its Motion to Stay Judgment as to the injunctive relief awarded in this case.

---

[1] 391 B.R. 577 (E.D.La. 2008).

[2]  366 B.R. 584 (Bankr. E.D.La. 2007), *supplemented, by In re Jones*, 2007 WL 2480494 (Bankr. E.D.La. 2007).

**Law and Discussion**

The portion of the Judgment at issue is:

FINALLY, IT IS ORDERED, that Wells Fargo conduct an audit of all proofs of claim filed on its behalf in this District in cases pending on, or filed after, April 13, 2007, and to provide a complete loan history on every account. For every debtor with a case still pending in the District, the loan histories shall be filed into the claims register and Wells Fargo is ordered to amend, where necessary, the proof of claim already on file to comply with the principles established in this case and *Jones*. For closed cases, Wells Fargo is ordered to deliver to Debtor, Debtor's counsel and Trustee a copy of the accounting.[3]

As explained in the denial of Wells Fargo's Motion to Stay Judgment (P-98), Wells Fargo is not entitled to a stay pending appeal as a matter of right. A stay of non-monetary relief is purely within the Court's discretion.[4] In the Fifth Circuit, a four prong test guides the Court in the exercise of its discretion. "The party who seeks a stay must show: (1) likelihood of success on the merits, (2) irreparable injury if the stay is not granted, (3) absence of substantial harm to the other parties from granting the stay, and (4) service to the public interest from granting the stay."[5] Wells Fargo bears the burden, and the failure to satisfy one prong of the standard justifies denial of the Motion.[6]

The Court previously considered these standards in its original denial of the Motion. Wells Fargo asks for reconsideration based on the intervening ruling in *Jones*. The effects of the *Jones* remand will be considered pursuant to Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60(b)(2).

---

[3] *In re Stewart*, No. 07-11113, (Bankr. E.D.La., filed April 10, 2008) (Judgment). April 13, 2007, is the date that the first *Jones* decision was entered. The Court chose that date because it is when Wells Fargo was formally put on notice that its accounting methods were improper.

[4] Fed. R. Bankr. P. 8005.

[5] *Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1067 (5th Cir. 1986), *citing Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982).

[6] *See, In re Section 20 Land Group, Ltd.*, 252 B.R. 819, 821 (Bankr. M.D.Fla. 2000).

Wells Fargo also submits in support of reconsideration, additional and belated arguments. For example, through a late filed pleading, Wells Fargo raised its issues on appeal as additional grounds for reconsideration. Neither these nor the other grounds asserted were raised in Wells Fargo's original Motion to Stay Judgment. They are not a result of newly discovered evidence, mistake, inadvertence, surprise, or excusable neglect. Wells Fargo does not claim that its failure to previously assert these issues stems from a fraud, misrepresentation, or misconduct of an opposing party. The Judgment in question is neither alleged to be void, nor has it been satisfied or released. At this late date, the only ground for reconsideration is Fed. R. Civ. P. 60(b)(6). The Court finds that no reasonable justification exists for consideration of the issues presented in Wells Fargo's appeal brief or the other grounds raised. However, for completeness sake, they will be discussed.

I. Likelihood of Success on the Merits.

A. The Likelihood of Remand. The District Court affirmed *Jones*, but remanded for additional findings regarding the injunctive relief awarded. Citing *VRC LLC v City of Dallas,* 460 F.3d 607 (5th Cir. 2006), the District Court requested further findings regarding the traditional test for injunctive relief. The District Court noted however, "[t]he power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is, therefore, inherent in a court of bankruptcy."[7]

Wells Fargo argues that because the Judgment contains a measure of injunctive relief, and because the Memorandum Opinion does not discuss the traditional factors enumerated by the Fifth Circuit in *City of Dallas*, it is likely that the Court's findings will also be remanded for further

_____

[7] *Jones,* 391 B.R. at 609, *citing, Continental Illinois Nat. Bank and Trust Co. of Chicago v. Chicago, R.I. & P. Ry. Co.*, 294 U.S. 648, 675, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

consideration.  Therefore, success on the merits of its appeal is likely.[8]  This Court does not agree.

Several Fifth Circuit opinions hold that the traditional standards for injunctive relief (*i.e.* irreparable injury and inadequate remedy at law) are inapplicable to injunctions issued to protect a court's inherent jurisdiction and to control its docket are not subject to the traditional standards for injunctive relief.[9]  Where monetary sanctions are ineffective in deterring vexatious filings, injunctions are appropriate.  The court's power to enter such orders flows not only from various statutes and rules relating to sanctions, but the inherent power of the court to protect its jurisdiction, its judgments, and to control its docket.[10]

In determining the propriety of a sanction in the form of injunctive relief, a Court considers the party's history of litigation, whether or not it has a good faith basis for pursuing the litigation, the extent of the burden on the court and other parties resulting from the party's filings, and the adequacy of alternative sanctions.[11]  All of these factors were considered and discussed in the *Stewart* Opinion.

---

[8] Wells Fargo also fails to distinguish between remanding a case for additional consideration and success on the merits.  The District Court affirmed the substantive holding contained in the decision.  Success on the merits does not include the probability of an order remanding for additional findings.  *Hanrahan v. Hampton*, 446 U.S. 754, 100 S.Ct. 1987 (1980); *Northwest Administrators, Inc. v. B.V. & B.R., Inc.,* 813 F.2d 223, 227 (9th Cir. 1987).

[9] *Baum v. Blue Moon Ventures, L.L.C.*, 513 F.3d 181 (5th Cir. 2008); *Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 359 (5th Cir. 1986).

[10] *Farguson,* 808 F.2d at 359.  The Fifth Circuit confirmed that this inherent power also resides with bankruptcy courts for bad faith conduct occurring in proceedings before them. *Citizens Bank & Trust Co. v. Case*, 937 F.2d 1014 (5th Cir. 1991).

[11] *Blue Moon Ventures,* 513 F.3d at 189.

**History of Litigation**.  In this and other cases brought by debtors in this district against Wells Fargo, a plethora of evidence has been assembled regarding Wells Fargo's business and accounting practices.  By its own admission, Wells Fargo has confirmed that the practices revealed in *Jones,*[12] *Stewart*,[13] and *Fitch*[14] are common to all its files.

In *Jones*, this Court found that Wells Fargo failed to apply payments received from the Chapter 13 Trustee to prepetition arrearages.  It also failed to apply payments made by the debtor to postpetition installments as required by the confirmed plan, Bankruptcy Code, state law, and orders of the Court.  *Jones* enforced the terms of the note and mortgage and required the application of payments and imposition of fees and charges in accordance with state law and the Bankruptcy Code.  In lieu of punitive monetary sanctions, Wells Fargo was required to administer loans involved in bankruptcies pending before this Court in accordance with the ruling.

In *Stewart*, Wells Fargo managed to reform its loan history to comply with the proper application of payments from the Trustee and debtor to the broad categories of pre and postpetition debt.  However, Wells Fargo failed to apply, within these temporal categories, the payments as required by the terms of the debtor's note and mortgage.  *Just as important, Wells Fargo did not audit the loan history of this debtor and correct its accounting until the claim was challenged, although it had reason to know that this and other proofs of claim on file in the District probably did not comply with either the Bankruptcy Code, confirmed plans, the orders rendered, or the terms of the individual notes and mortgages.*

---

[12] *See supra* note 2.

[13] 391 B.R. 327 (Bankr. E.D.La. 2008).

[14] 390 B.R. 834 (Bankr. E.D.La. 2008).

**Good Faith**.  Wells Fargo's insistence that it cannot be forced to correct obvious and blatant administrative errors on loans under the jurisdiction of this Court is without defense.  While Wells Fargo characterizes the Court's actions as extrajudicial, they are firmly within its jurisdictional purview.  All courts have the both the power and duty to ensure that pleadings, such as proofs of claim, filed in the district be, as Wells Fargo represents under penalty of perjury on signing, accurate to the best of its knowledge and ability.[15]

The requirement that payments made by the debtor or trustee be properly applied is fundamental, and Wells Fargo's issues on appeal do not posit serious opposition to the Court's view of how payments should be applied.   The importance of accurate proofs of claim cannot be overstated.  Mortgage loans are usually the largest claims in consumer cases.  The parties and Court routinely rely on proofs of claim in the formation and confirmation of plans, the calculation of payments due, and the granting of relief from the automatic stay.

Given the admitted misapplication of payments systematically practiced by Wells Fargo, it is likely that trustees and debtors are paying on proofs of claim that are clearly erroneous.[16] This Court can only assume that a review of the loans in question will necessitate amendments to proofs of claim.  However, until Wells Fargo conducts audits of these accounts and supplies loan histories, this is only an assumption which awaits confirmation.

---

[15] *In re Dansereau*, 274 B.R. 686 (Bankr. W.D.Tex. 2002), *aff'd sub nom*, *Cash-N-Advance v. Dansereau*, 64 Fed.Appx. 417 (5th Cir. 2003); *In re Rogers*, 391 B.R. 317 (Bankr. M.D.La. 2008); *In re Knox*, 237 B.R. 687 (Bankr. N.D.Ill. 1999); *In re McAllister*, 123 B.R. 393 (Bankr. D.Or. 1991); *In re Hamilton*, 104 B.R. 525 (Bankr. M.D.Ga. 1989).

[16]  Over eight pages of the Court's Opinion address the systematic, computerized administration of Wells Fargo's loans and why the computer logic applied is inconsistent with the terms of the notes, mortgages and plans involved.

In lieu of punitive sanctions, the *Jones* decision implemented procedures to rectify this problem; procedures that were consensual, but later recanted by Wells Fargo. In *Stewart*, the procedures were mandated because Wells Fargo did not honor its pledge to rectify the admitted errors in its accounting system.

**Burden on the Court and Related Parties**. With hundreds of cases affected by this revelation, the burden on the Court and parties in the District is evident. Wells Fargo would have this Court conduct trials on every proof of claim in the District simply to enforce the holdings set forth in *Jones* and *Stewart*. Those holdings describe how payments received from trustees and debtors should be applied to pre and postpetition categories of debt. They also stress the importance of complying with the applicable payment provisions in notes and mortgages. Under the specious argument that no case or controversy exists, Wells Fargo maintains that it can flaunt this Court's rulings and its own contractual responsibilities and force every debtor to "prove" that it has misapplied payments. This is a ridiculous waste of judicial resources and an unacceptable burden on the trustees and debtors of the District. Having admitted to a systematic error in the administration of its loans, it is incumbent upon Wells Fargo to correct its error for all affected debtors. To do otherwise is to ignore its obligation to correct pleadings that are no longer accurate.[17]

---

[17] *See, Moser v. Bret Harte Union High School Dist.*, 366 F.Supp.2d 944, 986 (E.D.Cal. 2005)(noting that a party "has a duty to be honest and to correct any factual errors, to notify its attorneys to enable them to file corrections or amended papers and to ensure that the same mistakes were not repeated in future pleadings"), *see also,* Bankruptcy Rule 9011, Louisiana Rule of Professional Conduct Art. 16, Rule 3.3 (Candor Toward the Tribunal), and *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 111 S. Ct. 922, 112 L.Ed.2d 1140 (1991)(holding that the Rule 11 objective standard applies to attorneys, pro se litigants, and any party that signs a pleading, motion, or other paper).

**Adequacy of Alternative Sanctions**.  This Court has the inherent authority to investigate Wells Fargo's proofs of claim to ascertain whether a fraud has been committed on the Court through a clear disregard of the proper application of payments on loans under court supervision.[18] Furthermore, this Court has the power to "fashion an appropriate sanction for conduct which abuses the judicial process."[19]

The Court chose injunctive relief as the only viable alternative to this problem because it believes that monetary sanctions will prove ineffective as a deterrent to future conduct. As set forth in *Jones*:

> The imposition of monetary sanctions to reimburse Debtor for costs and legal fees incurred will not, in this Court's opinion, deter Wells Fargo from future objectionable conduct.  Wells Fargo is a national lender, listed on the New York Stock Exchange, with considerable financial resources.  The imposition of a $67,202.45 damage award is *de minimus*, and insufficient to act as a deterrent to future misconduct.[20]

As this Court noted in the *Stewart* Opinion,

> The reconciliation of Debtor's account took Wells Fargo four months to research and three hearings before this Court to explain.  An account history was not produced until two months after the filing of the Objection....

> In the end, Wells Fargo charged nine (9) BPOs to Debtor's account but could only produce two corresponding reports.  As least three sets of BPOs were duplicative of each other; two BPOs were probably never performed due to the closure of Jefferson Parish following Hurricane Katrina; and all contained hidden fees for Wells Fargo disguised as costs.  Only two BPOs were ultimately accepted as validly performed.

---

[18] *See* discussion pgs. 21-23, *infra*.

[19] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45, 111 S.Ct. 2123, 2132-33, 115 L.Ed.2d 27 (1991).

[20] *In re Jones*, 2007 WL 2480494, at * 5 (Bankr. E.D.La. 2007).

> Wells Fargo charged Debtor with forty-four (44) inspections ...[and] forty-nine (49) late charges...Almost every disallowed inspection and late fee was imposed while Debtor was making regular monthly payments, *was assessed under circumstances contrary to Wells Fargo's stated policies or the Note's terms....*[emphasis added]

> \*\*\*

> But one of the most troubling problems with the accounting delivered by Wells Fargo was the preference for the payment of fees and charges over escrow, principal, and interest payments in contravention of the Note and Mortgage's clear terms.[21]

The process begins with disclosure. The audits will ensure that the appropriate parties and Court can rely on the information supplied in Wells Fargo's proofs of claim. The audit requirement set forth in *Stewart* ensures that Wells Fargo's pleadings do not commit a continuing fraud upon the Court.

Wells Fargo claims that the requirement to amend proofs of claim is an improper *sua sponte* reconsideration of previously allowed claims. Specifically, Wells Fargo argues that the audit of its accounts will require it to remove legally assessed fees and charges without objection.[22] The decisions do not prejudge the propriety of any charge Wells Fargo reasonably believes it is entitled to assess under the terms of its documents and controlling law. The *Stewart* holding simply requires Wells Fargo to supply a historical accounting for every loan pending in the District, reflecting what fees and charges it has assessed against each account. It does not negate any substantive rights available to Wells Fargo in other cases, nor does it direct the removal of any fee or charge. Given that the fees and charges disallowed in *Jones* and *Stewart* were based on the factual findings of the

---

[21] *In re Stewart*, 391 BR at 355, *see also* December 4, 2007, Trial Transcript 265:4-20 (P-54) for testimony regarding Wells Fargo's inspection policies.

[22] While Wells Fargo spends much of its focus on the discretionary nature of fees and charges and the substitution of the Court's judgment for its own, *Jones* and *Stewart* focus almost completely on the application of payments, not individual charges and fees.

particular cases, the rulings are far from an edict to remove any specific charge or fee. Having said this, should the audit process reveal an assessed fee or charge which appears improper,[23] it is assumed that Wells Fargo would adjust the account and the proof of claim accordingly.

Assuming, after audit, Wells Fargo believes that every charge assessed against its borrowers is appropriate, no amendment to the proof of claim would be necessary.[24] However, even in that instance, conducting audits and attaching account histories to all proofs of claim will still serve the public interest. Historically, Wells Fargo did not advise borrowers in default or bankruptcy that fees or costs were being assessed on their accounts. Therefore, remedial action is required. Through the submission of loan histories, trustees and debtors will perhaps learn for the first time whether individual accounts have been assessed charges or fees that might be objectionable. To the extent trustees or debtors believe a charge is inappropriate and object to the proof of claim, the issue can be addressed by the Court. While revealing an account's loan history might subject Wells Fargo to potential objections, to complain of this result is frivolous. Every proof of claim is subject to objection until judicially allowed and Wells Fargo's proofs of claim are no different.[25]

---

[23] For example, in both *Jones* and *Stewart*, charges appeared on the debtors' accounts that were in error or could not be substantiated or explained.

[24] This requires application of payments to the proper category of pre or postpetition debt as well as to the proper charge within that temporal category based on the order of application of payments required by the note and mortgage as well as state law.

[25] *See, In re Kolstad*, 928 F.2d 171, 173-74 (5th Cir. 1991)("The claims filing deadlines... by no means fix in stone the final 'allowed' amounts of claims. ... There is no bar date or deadline for filing objections. Once an objection is filed, the final amount of claim is determined by litigation in an adversary proceeding."); *In re Simmons*, 765 F.2d 547 (5th Cir. 1985)(noting that Bankruptcy Rule 3007 does not establish a time limit for objecting to a claim, however deeming properly filed claim an allowed secured claim *for purposes of confirmation*).

The facts in *Stewart* are similar to those in *In re Dansereau*.[26]  In *Dansereau,* an unsecured creditor repeatedly filed proofs of claim asserting priority status without a legal or factual basis.  The court sanctioned the creditor by reducing each improperly filed claim to $1.00 and entered an injunction prohibiting the creditor from improperly asserting priority status on any future proof of claim.[27]  Relying upon Fed.R.Bankr.P 9011 and § 105, the *Dansereau* Court noted that it had the "power to control its docket and to prevent abuses of that docket such as has been caused by [the creditor's] groundless assertion of priority status...."[28] *Dansereau* was affirmed by the Fifth Circuit.

The Court, therefore, concludes that the record of the case and the Opinion rendered adequately address the considerations for the award of injunctive relief as sanctions in this case.  Therefore, a remand is not likely on the merits.

B.  The Merits of the Issues Raised on Appeal and Their Likelihood of Success.  Wells Fargo incorporates the issues on appeal as additional grounds for stay of judgment.  Wells Fargo's arguments are broadly summarized:

1.  The National Bank Act ("NBA") and Office of Comptroller of the Currency ("OCC") Regulations allow national banks to establish non-interest related fees and costs at their discretion.  Therefore, any review of fees and costs established interferes with the national supervision of banks by the OCC.

---

[26] 274 B.R. 686 (Bankr. W.D.Tex. 2002), *aff'd sub nom*, *Cash-N-Advance v. Dansereau*, 64 Fed.Appx. 417 (5th Cir. 2003).

[27] *Id.* at 690.

[28] *Id.* at 689-90.

2. The imposition of late fees is a matter of contract and is not subject to a reasonableness standard or the failure to notice Debtor of the imposition of the charge.

3. The mortgage provides that, on default, Wells Fargo may take whatever steps it deems necessary to preserve and protect the property securing the note. Therefore, the contract does not allow the court to review those decisions for reasonableness.

4. The *Stewart* and *Fitch* decisions are not consistent with the Real Estate Settlement Procedures Act ("RESPA") and are, therefore, erroneous.

5. This Court's exercise of jurisdiction over cases in Section B is extrajudicial because those matters are not pending before it.

6. This Court has exceeded its authority by legislating from the bench, by deciding issues that are not part of an actual case or controversy, and by ignoring the limits set by §105(a).

<u>1. The National Bank Act and OCC Regulations.</u>

Wells Fargo's argument that the NBA and OCC Regulations preempt the otherwise applicable state and federal bankruptcy laws was not raised at the trial level. Grounds for relief or defensive theories not asserted at the trial court level are waived on appeal.[29]

Even so, nothing in the NBA or OCC Regulations cited by Wells Fargo substantiates its claim that the provisions are inconsistent with state law or the Bankruptcy Code. The relevant provisions allow a national bank to set fees and charges pursuant to safe and sound banking practices. In other words, they merely allow national banks to set their fees and charges without

---

[29] *Moody v. Empire Life Ins. Co.*, 849 F.2d 902, 905 (5th Cir. 1988).

oversight of the OCC.[30]

Wells Fargo incredibly asserts that by reviewing the broker's price opinion ("BPO") charges assessed in *Stewart,* this Court infringed upon the OCC's authority to regulate national banks. The argument begins by asserting that "regulations promulgated by the OCC make clear that a national bank's real estate lending activities are immune from state visitorial control and from state laws that burden national banks or the OCC in the exercise of their powers."[31]  To this assertion Wells Fargo adds that "the NBA and the OCC regulations make clear that the real estate lending powers of a national bank may not be constrained by state actors."[32]  Then, Wells Fargo draws the conclusion that "[w]hile the Bankruptcy Court is not a state entity or actor, the strong public policy behind these preemption principles apply equally to the Bankruptcy Court's actions in this context."[33]  Wells

---

[30]  Whether the charges in question fall within the OCC guidelines is subject to dispute. OCC guideline 12 C.F.R. § 7.4002 gives national banks the authority to charge customers "charges and fees."  The fees and charges contemplated by Section 7.4002 are NSF or overdraft fees, *see White v. Wachovia Bank, N.A.,* 563 F.Supp.2d 1358 (N.D.Ga. 2008) and  *Montgomery v. Bank of America Corp.*, 515 F.Supp.2d 1106 (C.D.Cal. 2007); ATM fees, *see Bank of America v. City and County of San Francisco*, 309 F.3d 551 (9th Cir. 2002); fees charged by a bank to non-account holders for cashing checks drawn on that bank, *see Wells Fargo Bank of Texas NA v. James*, 321 F.3d 488 (5th Cir. 2003) and *NNDJ, Inc. v. National City Bank*, 540 F.Supp.2d 851 (E.D.Mich. 2008); underwriting, tax service, document preparation fees, *see Martinez v. Wells Fargo Bank, N.A.*, 2007 WL 963965 (N.D.Cal. 2007); currency conversion fees and similar account related fees and charges, *see In re Currency Conversion Fee Antitrust Litigation*, 2003 WL 22097502 (S.D.N.Y. 2003).

In *Stewart*, the only fee challenged based on the amount charged was Wells Fargo's practice of assessing $95.00 to $125.00 for a BPO when it actually paid $50.00.  The problem with Wells Fargo's argument is that BPOs are neither charges, nor are they fees, but a cost incurred during the foreclosure process.  It is questionable that OCC guidelines entitle Wells Fargo to add a surcharge to BPO expenses as a "charge or fee" any more than they authorize a profit margin on attorney's fees or sheriff's costs.

[31]  Appellate Brief on Behalf of Wells Fargo, August 15, 2008, p. 21.

[32]  *Id.*

[33]  *Id.*

-13-

Fargo's argument is not only hyperbolic, but frivolous based on the OCC's own guidelines.

The most obvious failure of Wells Fargo's logic is that bankruptcy courts are not state actors. Additionally, OCC guidelines provide a specific exception to the visitorial powers rule, stating that "[n]ational banks are subject to such visitorial powers as are vested in the courts of justice."[34] Thus, the Regulations do not shield fees and charges from review, nor do they eliminate a review of fees or charges challenged by borrowers from the subject matter jurisdiction of the federal courts.

Bankruptcy courts have core subject matter jurisdiction over objections to claims presented against the estate.[35] Those claims are reviewed by the bankruptcy courts under applicable state, federal, and bankruptcy law. Nothing in the NBA or OCC Regulations is inconsistent with the discharge of this duty.

In *Stewart*, the only fee challenged based on the amount charged was Wells Fargo's practice of assessing $95.00 or $125.00 for a BPO when it actually paid $50.00. This Court found that Wells Fargo misrepresented to the debtor, as well as the Court, that the charge assessed for a BPO was merely a "pass through" of an expense incurred with a third party vendor.[36] As it turned out, this was false. Wells Fargo pays $50.00 for a BPO while charging customers $95.00 to $125.00. The Court reduced the charge to the amount incurred in part because Wells Fargo represented that this was its policy. In addition, the Court sanctioned Wells Fargo for misleading the Court and Debtor as to the nature of the charge. The *Stewart* Opinion makes no finding as to the reasonableness of charging $125.00, $95.00, or $50.00 for a BPO. What disturbed this Court was the

---

[34] 12 C.F.R. § 7.4000(b)(2).

[35] 28 U.S.C. § 157(b)(2)(B).

[36] *In re Stewart*, 391 B.R. 327, 346 (Bankr. E.D.La. 2008).

misrepresentations of Wells Fargo to the Debtor and Court on the issue and the additional time and expense incurred to learn the truth.

Thus, either because the defense was not raised at the trial level or is inapplicable to the facts at hand, this Court does not conclude that Wells Fargo's position with regard to the NBA and OCC Regulations has a likelihood of success on the merits on appeal.

### 2. The imposition of late fees

The Court did not review the late fees assessed by Wells Fargo on a reasonableness standard, but did so under contract law. As Wells Fargo admits, the terms of the note and mortgage govern the imposition of late fees. This Court's Opinion discussed paragraph 7(A) of the note, which states, "[the Debtor will pay the] late charge promptly, but only once on each late payment."[37] The Court also relied upon paragraph 27 of the mortgage, which provides that "[b]orrower shall pay to Lender a late charge of 5 percent of any monthly installment of principal and interest as provided in the Note not received by Lender within 15 days after the installment is due."

As acknowledged by this Court, Louisiana law permits lenders to assess late charges if agreed to by the parties.[38] The ruling by this Court was based on an interpretation of two provisions of the note and mortgage. For the reasons set forth in the Opinion, this Court determined that Wells Fargo's interpretation of its contract was incorrect. This Court held:

> [T]he Mortgage allows Wells Fargo to collect a late charge if a payment is more than fifteen (15) days delinquent. The Mortgage does not, however, allow Wells Fargo to assess a late charge for each subsequent month until the default is cured. If a borrower misses a payment in December 2000, but makes timely payments in January, February, and March of 2001, the borrower has missed one

---

[37] *See* Claim 1-1 for a copy of the loan documents.

[38] *Id*. at 333.

payment, not four. Wells Fargo, however, reads the relevant provision to allow an assessment for each month until the borrower cures the initial default. This interpretation is unreasonable.

The result of Wells Fargo's position in this case is the imposition of a fine or penalty of $360.23 in late fees over a thirteen (13) month period for one $554.11 missed payment. During this same period the past due principal balance on the missed payment continued to bear interest. Therefore, the imposition of the late fee was a penalty for the failure to pay accrued interest. The penalty amounted to an additional charge of 100% per annum. The Court does not find this a reasonable interpretation of the contract's terms.

Ambiguity in a contract is construed against the drafter; Wells Fargo. The Note provides that only one penalty may be assessed for a missed payment. Given that the Debtor made regular installment payments throughout the life of her loan, the Court interprets the Mortgage to allow the assessment of one late charge on any payment not received within fifteen (15) days of the date due, but not for each and every month following until the initial default is cured.[39]

Nothing in the Opinion based the denial of late charges on a failure to notice Debtor or the reasonableness of the amount provided by the contract. The Court's decision relied on the interpretation of the contract as written. Nothing presented by Wells Fargo on appeal changes the Court's view of that interpretation. Therefore, this Court cannot conclude that Wells Fargo will be successful on the merits of its appeal.

Wells Fargo argues that the Court's interpretation of its contract is wrong. Assuming on appeal that the District Court were to agree, Wells Fargo would increase its claim by $332.52, representing the late charges stricken by this Court. Even so, a reversal on this issue would not warrant a reversal on any of the other substantive rulings. Wells Fargo would still have misapplied payments and violated the terms of its own note and mortgage. Its policies would still be applicable to all loans it administers. Therefore, this Court's directive to audit the other proofs of claim in order to protect the integrity of the court system would still be sound.

---

[39] *Id*. at 349-50 (citations omitted).

3.  **The ability of Wells Fargo to take whatever steps it deems necessary to preserve and protect the property securing the note.**

Wells Fargo asserts this issue with regard to the Court's review of inspection charges.[40] The mortgage plainly provides :

> Lender or its agent may make reasonable entries upon and inspection of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.[41]

Wells Fargo failed to establish a reasonable cause for the forty-four (44) inspections it ordered.  It also admitted that it failed to notify Debtor that any of these inspections were occurring.  Despite the direct and unambiguous provisions of the mortgage, Wells Fargo maintains that the Court's review of the reasonableness of its decisions impermissibly substitutes the Court's judgment for its own. The mortgage requires that the lender make only *reasonable* inspections for *reasonable* cause. Debtor challenged the charges as unreasonable.  The Court, by default, became the arbiter of the dispute.

In this case, the facts established that Wells Fargo never read a single inspection report performed on Debtor's property.  Of forty (40) reports produced, twenty-four (24) inspections were conducted on a brick frame house while sixteen (16) were on a wood frame home, at a minimum

---

[40]  Wells Fargo's Appellate Brief also asserts the same argument with regard to BPO charges.  However, the *Stewart* Opinion does not review BPO charges for reasonableness but merely accuracy.  Of the nine (9) charges requested, only two reports were produced calling into question whether or not the other seven (7) charged to Debtor's account were actually performed.  Two of the missing BPOs were allegedly made while Jefferson parish was closed to outside traffic after Hurricane Katrina, three were duplicative charges, and no additional evidence to establish the remaining two missing reports was offered.  As a result, seven of the charges were eliminated simply because Wells Fargo failed to establish that the expenses had been incurred.  None were denied based on unreasonableness.

[41] Mortgage, ¶ 9.

indicating that the wrong property was inspected half the time. The inspections occurred every 54 days for over 79 months with every report indicating that the property was occupied and in good condition. Wells Fargo offered no explanation as to why so many inspections were necessary or advisable, other than a general belief that loans in default create a risk for the collateral. Under these facts, the Court held that the inspections were not reasonable. Wells Fargo's failure to notify the debtor of the inspections constituted additional grounds for denial.

Wells Fargo argues that this Court's reasonableness determination was "arbitrary and ambiguous," and that the *Stewart* Judgment prohibits it "from operating under uniform, consistent and practical nationwide standards."[42] This argument is fatally flawed. First, based on this and other cases tried in this Court, it is apparent that Wells Fargo either does not have national standards or routinely fails to follow alleged guidelines for instituting inspections.[43] Second, Wells Fargo has testified that loan administration can be altered to individually account for differences in law and jurisprudence from jurisdiction to jurisdiction, a court within a jurisdiction, and even a judge within a court.[44] This calls into question Wells Fargo's need to employ "uniform, consistent and practical nationwide standards."

For these reasons, the Court does not believe that Wells Fargo has a likely probability of success on appeal.

---

[42] Appellate Brief on Behalf of Wells Fargo, August 15, 2008, p.23.

[43] *In re Stewart*, 391 B.R. 327, 343 (Bankr. E.D.La. 2008).

[44] *Id.* at 339.

4.  The *Stewart* and *Fitch* decisions and RESPA.

In *Stewart*, this Court rendered a decision on the correct calculation of escrow amounts owed by a debtor pre and postpetition.  At least twice in its appellate brief, Wells Fargo insists that this Court miscalculated the amount due for escrow because it applied amounts held in suspense first before calculating debtor's escrow obligations.  Wells Fargo insists that nothing in RESPA requires the application of amounts held in a suspense account to escrow obligations.[45]

RESPA allows a lender to estimate the insurance premiums and property tax charges that will accrue in the coming year against the property it holds as collateral.[46]  To this amount the lender is entitled to add one-sixth of the total estimated charges as a cushion against future price increases. The lender then divides this total by twelve (12), collecting one-twelfth of the total every month.

Suspense accounts are nothing more than holding accounts created by lenders to deposit funds delivered by a borrower to the lender but not applied to the loan.  Under the terms of the note and mortgage, funds delivered by a borrower must be applied in an defined order of preference. Generally, the first application is to outstanding escrow obligations.  After escrow has been satisfied, payments are to be applied to accrued and unpaid interest charges, then to unpaid principal, and finally costs and fees.  Nothing in RESPA prohibits the application of funds in suspense to satisfy a debtor's outstanding escrow balance.  The note and mortgage, however, require that escrow obligations be satisfied in preference to all others.  Therefore, the suspense account balances should have been used to reduce the escrow obligations of the debtors before application to lower ranking fees and charges.  Wells Fargo argues that this interpretation is contrary to the Bankruptcy Code and

---

[45]  Appellate Brief on Behalf of Wells Fargo, August 15, 2008, p.31.

[46] 12 U.S.C. § 2609.

RESPA. After rendering *Stewart*, the Fifth Circuit considered a similar claim in the case of *Campbell v. Countrywide Home Loans, Inc..*[47]

In *Campbell*, the bankruptcy court required that the lender include prepetition missed escrow payments in its proof of claim as prepetition debt. The lender objected, arguing that RESPA allowed it to collect missed prepetition escrow payments through postpetition installments. The lender further argued that to require it to wait for the reimbursement of missed prepetition escrow payments was the equivalent of forcing it to advance sums in favor of the debtor. The Fifth Circuit disagreed and upheld the methodology of the bankruptcy court.[48] Specifically, the Fifth Circuit held that missed prepetition escrow payments constitute a prepetition claim, and are only recoverable through the proof of claim and plan process. As a result, this Court considers the issues presented in this case to be settled by Fifth Circuit precedent and unlikely to be overturned on appeal.

5. The Bankruptcy Court's exercise of jurisdiction over cases in section B.

Wells Fargo argues that this Court has exceeded its jurisdiction by ordering audits of its loans in both sections A and B of the Eastern District. *Blue Moon Ventures*[49] supports this Court's ruling. In *Blue Moon Ventures*, the Fifth Circuit upheld a District Court's pre-filing injunction that prohibited the plaintiff from "directly or indirectly filing claims in federal bankruptcy courts, federal district courts, and federal agencies in the state of Texas without the express written permission of

_____

[47] – F.3d –, 2008 WL 4542843 (5th Cir. 2008).

[48] *Id.* Briefly, the Court also notes that it is unlikely that Wells Fargo will have to "advance" funds postpetition, based upon the requirements of *Fitch* and *Campbell*. Most, if not all, mortgages require lenders to first apply payments to negative escrow balances. By including a debtor's missed escrow payments in its proof of claim, any payments received from the trustee on the proof of claim will be applied first and completely to escrow until it is current.

[49] *See supra* note 9.

[the District Court Judge]."[50]  The Fifth Circuit determined that such an injunction was necessary to prevent the plaintiff from engaging in abusive litigation tactics in the same way that this Court determined that extending the audit to section B was necessary to prevent Wells Fargo from abusing the claims process.

### 6.  The scope of this Court's authority.

Wells Fargo argues that the Court has exceeded its authority under § 105(a).  It is undisputed that "[b]ankruptcy courts cannot use their equity powers under Section 105(a) to fashion substantive rights and remedies not contained in the Bankruptcy Code or Rules or to negate substantive rights or remedies that are available."[51]  Wells Fargo's argument asserts that there is no substantive provision of the Bankruptcy Code requiring a creditor to conduct an audit of the proofs of claim it has filed in a particular judicial district.  Wells Fargo further argues that the Court has overridden the presumption of validity set forth in § 502, thereby exceeding the authority set forth by § 105.

While Wells Fargo is correct that bankruptcy courts cannot create remedies not contained within the Code or negate substantive rights that are available, it ignores the fact that one of the key functions of § 105(a) is to "prevent an abuse of process."[52]  "Abuse of process" is not defined by

---

[50] 513 F.3d at 194.

[51] *Matter of Smith*, 21 F.3d 660, 666 (5th Cir. 1994).

[52]  Section 105(a) provides that:

The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

the Bankruptcy Code. The Restatement (Second) of Torts defines it as "[o]ne who uses a legal process, whether criminal or civil, against another   primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process."[53] Some bankruptcy courts have simply stated that abuse of process consists of "maneuvers or schemes which would have the effect of undermining the integrity of the bankruptcy system."[54] As previously stated, the audit process is designed to expose any errors in Wells Fargo's proofs of claim and avoid an abuse of the bankruptcy system. As such, it is the least severe sanction available and specifically designed to address a particular wrong.

Bankruptcy courts also have an inherent authority to sanction parties and control their courts, beyond that set forth by § 105(a).[55] "It is well-settled that a federal court, acting under its inherent authority, may impose sanctions against litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct."[56] It is also established that "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum in their presence and submission to their lawful mandates."[57] This inherent power is "governed not by rule or statute but by the control necessarily

---

[53] Restatement (Second) of Torts § 682 (1977).

[54] *In re Eagle-Picher Industries*, *Inc.,* 169 B.R. 135, 138 n.1 (Bankr. S.D.Ohio 1994), *citing In re Calder* 93 B.R. 739, 740 (Bankr. D.Utah 1988), *see also In re Burrell*, 148 B.R. 820, 824 (Bankr. E.D.Va. 1992) (defining abuse of process as situation where inaction by the court "would undermine the integrity of the bankruptcy system.").

[55] *See, e.g., In re Yorkshire LLC,* 540 F.3d 328 (5th Cir. 2008)(affirming the inherent authority of the bankruptcy court).

[56] *Id*. at 332.

[57] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 2132 (1991)(citations omitted).

vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[58]  Of particular relevance to this case is the determination that "[a] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud."[59]  Courts also have the:

> historic power of equity to set aside fraudulently begotten judgments . . . necessary to the integrity of the courts, for tampering with the administration of justice in this manner involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public.[60]

The audits ordered by this Court serve a number of functions.  First, they ensure that Wells Fargo is not abusing the claims process and help preserve the integrity of the court.  Second, they will reveal whether or not Wells Fargo has received payments to which it is not entitled.  Third, the audits are narrowly tailored to regulate only the claims process.  As such, they are designed to effect the least severe means available to quell the offensive behavior.[61]  Finally, they are rehabilitative and educational in character because they will not only expose any defects in the claims on file, but will also provide Wells Fargo with the opportunity to correct its own errors.

Wells Fargo fails to appreciate the gravity and severity of its misapplication of payments.  As explained in *Stewart*, Wells Fargo overstated in its 2007 proof of claim the past due amounts owed by Debtor by $10,000.00.[62]  In *Jones*, Wells Fargo collected $24,450.65 more than it was

---

[58] *Id.*

[59] *Chambers*, 501 U.S. at 44, 111 S.Ct. at 2132 (citations and internal punctuation omitted).

[60] *Id.*

[61]  *See, Natural Gas Pipeline Co. of America v. Energy Gathering Inc.,* 86 F.3d 464, 467 (5th Cir. 1996) and *Thomas v. Capital Sec. Services, Inc.*, 836 F2d 866, 877 (5th Cir. 1988).

[62] 391 B.R. 327, 357 (Bankr. E.D.La. 2008).

entitled to receive;[63] a calculation which the District Court affirmed.[64]

In *Stewart*, Wells Fargo misapplied payments within the temporal categories of pre and postpetition debt, preferring to reimburse itself for fees and charges rather than reduce the Debtor's obligations for escrow charges, past due principal, and interest. This was directly contrary to the terms of its note and mortgage. The misapplications caused the Debtor's monthly installment payments to rise as Wells Fargo demanded that escrow charges be repaid over a twelve month period. This in turn created additional defaults. As this Court stated in *Jones*,

> The imposition of a large monetary fine may have a deterrent effect on Wells Fargo's future dealings with this and other courts, however, more often than not, punitive damages serve to enrich the immediate plaintiff with no guarantee that society will benefit. The Court believes it to be more productive and effective to accept Wells Fargo's offer to modify its practices. The imposition of a fine or penalty may be the only means of deterring a recalcitrant litigant, but the Court is convinced that it has secured Wells Fargo's attention and that its offer to amend its practices is real. As further assurance that Wells Fargo will implement the changes it has offered, the required changes will be implemented through the mechanism of a court order. This will allow this court to monitor Wells Fargo's practices and supply the means to address any future violations.[65]

Unfortunately, the Court's belief that Wells Fargo would correct its previously flawed accountings was not confirmed, and the ruling in *Stewart* is designed to enforce Wells Fargo's obligation to do so.

---

[63] 366 B.R. 584, 604 (Bankr. E.D.La. 2007).

[64] 391 B.R. 577 (E.D.La. 2008).

[65] 2007 WL 2480494, at *7 (Bankr. E.D.La. 2007).

Wells Fargo relies upon the decision in *In re White*[66] for its assertion that courts may not object to claims *sua sponte*. *White* held that a court could not object and rule upon the validity of a claim without giving the creditor notice that its claim was in jeopardy and providing it with an opportunity to clarify or supplement its claim.[67] This Court's ruling is exactly in line with the *White* decision. *Stewart* requires Wells Fargo to clarify its claims by attaching loan histories. The Court has not ruled on the validity of any of Wells Fargo's claims as filed, nor has it directed that any fees or charges contained in its accounts be eliminated. Wells Fargo's assertions to the contrary are premature.

II. Irreparable injury if the stay is not granted.

Wells Fargo argues that it will suffer irreparable injury if the stay pending appeal is not granted because it will have no recourse against any party to recoup the money or time spent in performing the audits. In theory, Wells Fargo may be correct as the Fifth Circuit has stated that "the key word is 'irreparable,' and an injury is irreparable only if it cannot be undone through monetary remedies."[68] Any money spent by Wells Fargo may not be recoverable; however, the damage to the debtors and the Court, should a stay issue, is potentially irreparable as well. Wells Fargo has argued on appeal in *Jones* that any payments made by a debtor or trustee over the life of a loan are "unrecoverable," even if they were made in error or applied to undisclosed fees or charges. While

---

[66] 908 F.2d 691 (11th Cir. 1990). Additionally, Wells Fargo cannot claim that it did not know that its claim was in jeopardy or that it faced sanctions. The potential for sanctions were specifically discussed at the September 25, 2007, and November 1, 2007, hearings on Debtor's Claim Objection.

[67] *Id.* at 695.

[68] *Enter. Int'l Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)(internal punctuation omitted).

this legal position did not prevail; the fact that Wells Fargo continues to urge it on appeal makes the need for timely audits all the more critical.

III.  Absence of substantial harm to other parties from granting the stay.

Wells Fargo argues that it and Debtor are the only two parties to the Judgment in question. This argument applies a very narrow definition of "party."   As contemplated by the judgment, the other parties are every debtor in the Eastern District with a Wells Fargo loan.  There is a risk of substantial harm to these parties because the longer Wells Fargo delays in conducting the audits, the greater the likelihood that the debtors and trustees will pay on inflated loan arrearages.  These payments affect not only the debtors' ability to confirm and maintain plans, but the distribution available to other creditor groups.  Given that Wells Fargo has argued in *Jones* that any payment made cannot be recovered, even if clearly in error, Wells Fargo now disingenuously argues that no harm will occur while it receives payments.

IV.  Service to the public interest from granting the stay.

Wells Fargo miscategorizes this prong as "public interest in regards to the stay," essentially attempting to switch its burden from having to prove that there is a public interest in granting the stay to simply showing that the public bears no interest in granting the stay.  Granting the stay would only encourage Wells Fargo to continue its abusive accounting procedures.  For affected debtors, there is a strong interest in immediately proceeding with the audits.  The sooner the accounts are verified, the better the chance that the proper distributions can be made to all parties involved.

Wells Fargo's argument that debtors will somehow be harmed by the audit is absurd and shows a limited understanding of chapter 13 practice.  Wells Fargo has demonstrated a pattern of overcharging borrowers and misapplying payments.  For a vast majority of debtors, any reduction

in the amount of Wells Fargo's claim will result in an earlier completion of the case, with no action necessary from the debtor. More importantly, any reduction may also benefit other classes of creditors who are primed by Wells Fargo's interests.

**Conclusion**

For the reasons set forth above, Wells Fargo has failed to meet its burden to show that it is entitled to a stay of the non-monetary portion of the *Stewart* Judgment. Wells Fargo is directed to immediately commence with the audit procedures set forth in the Judgment.

New Orleans, Louisiana, October 14, 2008.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge